DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Defendant/Appellant, Anthony Gooden, appeals his conviction in the Lorain County Court of Common Pleas. We affirm.
 {¶ 2} On November 18, 2004, Defendant was indicted on one count of murder in violation of R.C. 2903.02(A), a first-degree felony and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony. The charges were brought after Richard Armstrong was found stabbed to death in room 207 at the Journey Inn Motel in Elyria, Ohio on November 10, 2004. Armstrong had been stabbed 58 times, with four of the wounds being fatal. The matter was tried to a jury starting on May 8, 2006. On May 11, 2006, the jury *Page 2 
convicted Defendant of both charges. Defendant was sentenced to an aggregate term of eighteen years in prison. Defendant timely appealed his conviction and raises three assignments of error.
 Assignment of Error I "[Defendant's] conviction of Murder was against the manifest weight of the evidence."
 {¶ 3} Defendant asserts that his conviction was against the manifest weight of the evidence.
 {¶ 4} In determining whether a conviction is against the manifest weight of the evidence an appellate court:
 "[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 5} When Defendant makes a weight of the evidence challenge, he must establish that a greater amount of credible evidence supports one side of the issue than supports the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387. When reversing a conviction as being against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the fact-finder's determination of any conflicting testimony. Id., quoting Tibbs v. Floria (1982),457 U.S. 31, 42. Accordingly, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs *Page 3 
heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175. See, also Otten, 33 Ohio App.3d at 340.
 {¶ 6} Based on a review of the record, this Court finds it reasonable that the jury could have believed the testimony and evidence proffered by the State and convicted Defendant of both crimes.
 {¶ 7} Defendant was convicted of murder in violation of R.C.2903.02(A), which states that, "(A) [N]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy."
 {¶ 8} Defendant was also convicted of tampering with evidence in violation of R.C. 2921.12(A)(1), which states:
 "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 "(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation[.]"
 {¶ 9} The jury heard the testimony of the 21 witnesses, 19 for the State and two for the defense. Defendant did not testify.
 {¶ 10} Carlos Lauderdale lived next door to the Journey Inn in November of 2007. Lauderdale testified that he was with Armstrong on November 9, 2007, until 4:00 a.m. on November 10, 2007, and that Defendant was with them for a portion of the evening. Lauderdale testified that Defendant arranged for the threesome to purchase crack cocaine, which was delivered to them in room 207. *Page 4 
Lauderdale explained that Defendant was upset with him and Armstrong and himself because they had admonished Defendant about his drug use in the presence of a female resident of the Journey Inn who was in the room with them at the time. Lauderdale testified that he did not smoke any crack cocaine and did not see anyone else smoke it, although he broke off a crumb and gave it to Defendant. Lauderdale finally testified that Armstrong had a two to three inch paring knife in the room that night.
 {¶ 11} Lauderdale testified that when he left Armstrong's room around 4:00 a.m. on November 10, 2004, Armstrong was still alive. Lauderdale stated that later that morning, his live-in girlfriend woke him up to tell him that Defendant was downstairs with shaking hands saying that, "there's something wrong, something about some blood in a hotel room." Lauderdale identified Defendant in the courtroom.
 {¶ 12} Lauderdale testified that he then ran to the Journey Inn after Defendant came to his house and saw the crime scene and later learned that Armstrong was dead. Lauderdale acknowledged that he acted in a hostile manner to the police. Lauderdale admitted giving taped statements to the police.
 {¶ 13} Rebecca Glime lived directly behind the Journey Inn's trash dumpster on November 10, 2004. Glime worked part-time at the Journey Inn. Glime testified that she knew Defendant from her work at the motel. Defendant *Page 5 
and his girlfriend lived in room 205 at the Journey Inn. Armstrong lived and was found dead in room 207. Glime explained that she also knew Armstrong.
 {¶ 14} On November 10, 2004, Glime testified that she left her house at 7:25 a.m. and encountered Defendant around 7:30 a.m. in the parking lot of the Journey Inn wearing jeans and a beige hooded sweatshirt with some sort of graphic on the front of it. Glime testified that Defendant asked her if she was o.k., after which she "ran from the scene." Glime stated that she heard "[a]ll kinds of banging" from the motel that night, which caused her windows to rattle. Glime identified Defendant and photographs of the Journey Inn.
 {¶ 15} On cross-examination, Glime admitted that she did not tell defense counsel during an earlier interview that Defendant had spoken to her that morning. Glime denied that Lauderdale resembles Defendant. Glime admitted that her windows usually rattled when anyone slammed a door at the motel. Glime stated that Defendant did not have a car and that Armstrong had a bicycle.
 {¶ 16} Cecelia Parsons was Defendant's girlfriend on November 10, 2004, and the pair lived together in room 205 at the Journey Inn on that date. Parsons explained that Defendant kept his clothes in the hotel room in three black garbage bags. She testified that there had been several knives in the room, including one that Defendant had borrowed from a man in room 202. Parsons indicated that neither she nor Defendant had a car. *Page 6 
 {¶ 17} Parsons testified that she came home from work between 3:15 and 3:30 a.m. on the morning of November 10, 2004. Parsons stated that she noticed that one of Defendant's bags of clothes as well as a pair of boots and a pair of shoes were missing from the room. Parsons indicated that Defendant was in the room when she arrived, they spoke briefly, smoked a blunt, and then Parsons went to bed.
 {¶ 18} Parsons stated that she was awakened around 10:00 a.m. by the hotel manager and police knocking on her door. Defendant was sitting in a chair in the room and told her that something had happened to the guy in room 207. Parsons indicated that she did not know if Defendant left the room after she went to sleep. Parsons further stated that she did not see the borrowed knife in the room that morning. Before she went to sleep, Parsons explained, Defendant was wearing a red t-shirt and jeans. When she woke up, he was wearing jeans and a black and grey zip-up sweater that said "Brooklyn" on it.
 {¶ 19} Parsons testified that she tried to use the restroom that morning, but was unable to flush the toilet because bloody towels were in the toilet tank. Shortly thereafter, the police came back to the room to speak to Defendant; only then did she notice that Defendant's hand was bleeding. The police arrested Defendant and she went to the police station and gave her statement. Parsons finally testified that she never found Defendant's missing clothes, shoes, or the knife. *Page 7 
 {¶ 20} Kumud Patel is the owner of the Journey Inn. She testified that she was working on November 10, 2004. Patel testified that she and a maintenance man (Goya) discovered the crime scene when they entered room 207 between 9:00 and 9:30 a.m. on November 10, 2004, to perform maintenance work. Patel testified that Armstrong had originally lived in room 108 but later moved to room 207. After seeing the blood, Patel testified she shut the door, went outside and saw Defendant, who asked her for toilet paper. Patel indicated that she asked Defendant to wake up his friend and then went to her office and called 911. Patel identified Defendant in the courtroom.
 {¶ 21} On cross examination, Patel acknowledged that she believed Defendant had stolen money from her office and that she had told Parsons that she no longer wanted Defendant on her property. Patel further acknowledged that lots of people came and went from Armstrong's room on a regular basis.
 {¶ 22} Jimenez Gregorio (Goya) was working at the Journey Inn on November 10, 2004, painting and conducting fire-alarm inspections. Gregorio's testimony supported Patel's testimony about discovering the blood in room 207. However, Gregorio testified that Patel told him that if something was wrong in that room, Armstrong could call the police himself. Gregorio testified that the pair just shut the door and went to the next room. Upon leaving the second room, Gregorio explained, they saw Defendant. Patel asked Defendant to check on Armstrong. Gregorio testified that Patel gave Defendant a key to room 207 and *Page 8 
then he and Patel went to room 210 to continue with their work. Gregorio explained that Defendant had a hard time unlocking the door so Patel helped him and then stayed with Defendant. Gregorio indicated that he also returned to room 207 and saw Defendant inside standing by Armstrong's body and Patel outside. Gregorio testified that Defendant and/or Patel then called the police. Gregorio identified Defendant in the courtroom.
 {¶ 23} On cross-examination, Gregorio testified that he had seen Defendant and Lauderdale in Armstrong's room two days earlier. Gregorio also stated that he saw Armstrong around 8:10 a.m. on November 10, 2004, standing near the stairs outside his room at the Journey Inn. Gregorio was sure of the time because he was at Lowe's when it opened at 8:00 a.m. and was returning to the Journey Inn with paint when he saw Armstrong.
 {¶ 24} Patrolmen Scott Willis was employed by the Elyria Police Department on November 10, 2004, and was a responding officer to the Journey Inn. Willis testified that he noticed spots of blood on the walkway outside the 2nd floor rooms that had already been marked by another police officer. Willis testified that he saw the victim lying face down on the floor, just inside the door of room 207. Willis testified that he spent three to four hours in the room photographing and collecting evidence. He removed and tagged approximately 50 pieces of evidence. When he left the room on November 10, 2004, he secured the door with red tamper-proof evidence tape. *Page 9 
 {¶ 25} Willis indicated that he returned to the scene the next day for a follow-up visit. Willis identified a field sketch, which demonstrated where each piece of evidence was found and crime scene photos, which included pictures of Armstrong; blood spots and spatters; items, furniture and documents in the room with blood on them; Armstrong's bicycle; and the room itself, as well as general pictures of the layout of the Journey Inn. One of the pictures showed Armstrong's back with blood marks that looked like it had been wiped off. Willis testified that the blood spots were in varying stages of drying. All evidentiary items confiscated were tagged and some sent to BCI for testing. Willis identified his BCI submission sheets and all items transmitted to BCI.
 {¶ 26} Willis also testified that police searched a 50 foot perimeter around the Journey Hotel and did not find any evidence. Willis noted that the dumpster on the premises had been emptied.
 {¶ 27} On cross-examination, Willis acknowledged that Armstrong's family brought additional evidentiary items to the police station that they had found in room 207, after the scene was released by police, including a piece of paper with blood on it. Willis also acknowledged that there was a great deal of blood at the scene and that the person who committed the crime "must have had some blood on them."
 {¶ 28} Dr. Paul Matus was the Lorain County coroner who conducted the autopsy of Armstrong. Matus identified his report and the autopsy photographs. *Page 10 
Dr. Matus testified that Armstrong was lying on his stomach at the scene. Dr. Matus determined the time of death to be between 3:30 a.m. and 7:30 a.m. Dr. Matus testified that Armstrong had 58 stab wounds, some of which were fatal and some of which were defensive wounds. Dr. Matus also testified that there was the presence of cocaine in Armstrong's blood and ethanol in the urine indicating that Armstrong had consumed alcohol prior to death. Dr. Matus finally testified that the weapon that was used to inflict Armstrong's wounds was a knife with a two and one-half to three and three-quarter inch blade that was approximately three-quarter of an inch in width and that all wounds were made by a knife with a similar blade.
 {¶ 29} On cross-examination, Dr. Matus admitted that there was a "good possibility" that the assailant would have had blood on him or her and "very possible" blood would have contaminated the assailant's hands. Dr. Matus stated, however, that DNA and blood could be washed away.
 {¶ 30} Detective Albert Urban, Jr. was employed by the Lorain County Police Department on November 10, 2004, and had been dispatched to the Journey Inn with a camera. Urban indicated that he took outside pictures at the Journey Inn and identified the pictures for the record and described each photograph. Among the pictures were blood spots, a cigarette butt, a glass shard, a broken key in the walkway and a panoramic picture of the inside of room 207 taken from the hallway outside, which showed a red stain on a pair of shoes and red stains on a *Page 11 
blanket. Urban stated that he and another officer also secured the area with police tape and by standing at either end of the outside walkway.
 {¶ 31} Detective Van Wormer is employed by the Elyria Police Department and responded to the Journey Inn on November 10, 2004. Van Wormer went to the scene with the crime scene van. Van Wormer testified that he and Willis found Armstrong and did a cursory search of room 207. Van Wormer then indicated that he returned to the crime scene van to get equipment and encountered Lauderdale, who was out of control and was arrested.
 {¶ 32} Van Wormer testified that he questioned Parsons in room 205 and that she gave him permission to search the room. Defendant was in room 205 when he arrived and bleeding from his hand. Van Wormer stated that he ordered Defendant to the hallway and to show his hands but Defendant refused after which they handcuffed him. Van Wormer explained that as he was cuffing Defendant outside of room 205, a few drops of blood fell from his hand onto the walkway. Van Wormer testified that he took pictures of room 205 and removed a white towel and rag from the toilet tank that had red spots on them. Van Wormer identified and described the pictures he took of room 205, including various pictures of items and places in the room on which red spots indicative of blood were found. Van Wormer also took a picture of a pocket knife and box cutter he found next to a woman's purse in room 205 and testified that the knife was one and one-half inches in length and neither the knife nor the box cutter had blood on *Page 12 
them. Van Wormer identified the items confiscated from room 205 and later taken from Defendant. Van Wormer testified that room 205 was secured with yellow police tape.
 {¶ 33} Van Wormer finally testified that he took fingernail scrapings from Lauderdale because he had been near the scene and was not yet ruled out as a suspect. Van Wormer identified Defendant in the courtroom.
 {¶ 34} On cross-examination, Van Wormer acknowledged that he found no bloody footprints in the vicinity of rooms 205 or 207, saw no blood on Defendant's clothing, and found no drugs. He also acknowledged that he did not check for any fingerprints in room 205.
 {¶ 35} Patrolman Robert Hudzinski is employed by the Elyria Police Department and responded to the Journey Inn on November 10, 2004. Hudzinski took photographs of room 108, the room previously occupied by Armstrong. Hudzinski identified the photographs for the record and described them. Among the photographs was a picture of a bloody towel in the toilet tank, which towel Hudzinski also identified as an exhibit. Hudzinski also testified that he checked for latent fingerprints in the bathroom. On cross-examination, Hudzinski acknowledged that he did not see blood anywhere else in room 108 or in the parking lot or walkway leading to room 108.
 {¶ 36} Kristen Kuhn is Armstrong's brother's girlfriend. She was dating Armstrong's brother (Aaron) on November 10, 2004. Kuhn testified that she and *Page 13 
Aaron went to the Journey Inn on November 13, 2007, to retrieve Armstrong's belongings after being advised by police that they could do so. Kuhn explained that they removed a piece of paper with phone numbers on it, a coffee pot and various other items. After noticing that the piece of paper had blood on it, Kuhn stated, she and Aaron took it to the Elyria Police Department. Kuhn identified the piece of paper for the record (the "note").
 {¶ 37} Patrolman Ilcisko is employed by the Elyria Police Department. Ilcisko received the items that Kuhn and Aaron Armstrong brought to the police station on November 13, 2007, and identified the note for the record. Ilcisko explained that he bagged the note and other items and took them to the detective bureau. The note was sent to BCI for testing.
 {¶ 38} Michelle Snyder is a latent print examiner for BCI. Snyder testified to the techniques used to examine prints and of the examination she did related to the Armstrong murder. Snyder testified that she examined a fingerprint on the note and determined that it belonged to the right index finger of Defendant.
 {¶ 39} David Niemeyer is employed by BCI as a forensic scientist. Mr. Niemeyer analyzes body fluids. Niemeyer identified two reports he generated after analyzing swabs and cuttings made from evidence in this case against known standards for Defendant, Armstrong, Parsons, and Lauderdale, among others. Niemeyer identified 20 items as being presumptive positive for blood. *Page 14 
 {¶ 40} Melissa Zielaskiewicz is employed in the serology/DNA section of BCI as a forensic scientist. Zielaskiewicz analyzed the samples received from Niemeyer against known standards for Armstrong, Defendant, Lauderdale, and Parsons, among others. Zielaskiewicz generated two reports of her analysis and identified those for the record. Zielaskiewicz testified that neither Armstrong nor Defendant could be excluded as the source of DNA on a swab from Armstrong's back or a cutting from the comforter found next to Armstrong's body. Zielaskiewicz further testified that Defendant could not be excluded as the source of DNA on the cutting and swabs from numerous other items found in rooms 207, 108 and 205, including Armstrong's pajamas he was wearing when he was found. Armstrong was excluded as the source of DNA on a towel found in room 207. Defendant could not be excluded as such source. Zielaskiewicz also testified that no foreign DNA was found on Armstrong's, Defendant's, or Lauderdale's fingernail scrapings. Zielaskiewicz finally testified that she tested the note for DNA but could not make a conclusion.
 {¶ 41} On cross-examination, Zielaskiewicz testified that water and soap will not destroy DNA, but that peroxide could. She further testified that she did not find Armstrong's DNA on any articles of clothing or in any of the rooms that were associated with Defendant. Zielaskiewicz explained though that she did not analyze any of Defendant's clothing. *Page 15 
 {¶ 42} Sergeant David Mayne is employed by the Elyria Police Department and responded to the scene at the Journey Inn on November 10, 2007. Mayne identified a broken key he found in the walkway outside of room 207. Mayne further testified that he saw Defendant after he had been arrested and noticed that he was bleeding. Mayne stated that he drove Defendant to the hospital, where he interviewed him and taped the conversation. Mayne identified the tape and it was played for the jury. The tape was made prior to Defendant being treated by medical personnel.
 {¶ 43} In the tape, a substantial portion of which is inaudible, Defendant stated that he had cut his hand on a can of tuna in room 108 or 109 of the Journey Inn, while visiting a man named Brandon. Defendant stated that he wrapped his cut hand in toilet paper while in Brandon's room and then returned to his room (205) and wrapped it in a towel. Defendant maintained that the cut had happened just prior to the officer's arrival to room 205. Defendant stated that he did not know the current location of the can of tuna and Mayne testified that no tuna can was ever found.
 {¶ 44} Regarding Armstrong's death, Defendant asserted that on the morning of November 10, 2004, he left his room at the insistence of Parsons to get toilet paper and ran into the hotel manager opening room 207 to test fire alarms. Defendant indicated that he saw the key break in the lock of room 207, after which a maintenance man produced another key and opened the door. Defendant *Page 16 
indicated that was when he first saw Armstrong's body. Defendant also stated that during this time, he saw Armstrong's cousin or nephew (presumably Lauderdale) standing around the corner "really mad."
 {¶ 45} Patrolman William Witt is employed by the Elyria Police Department and responded to the scene at the Journey Inn on November 10, 2007. Witt testified that he and his partner were the first officers to respond to the scene and found Armstrong's body after Patel let them into the room. Witt stated that he removed a tan comforter that was covering Armstrong's body, Lifecare personnel checked for vital signs, and Witt secured the scene. Witt testified that he was instructed to speak to Patel and get the telephone records from room 207. Witt identified the phone records for the jury. Witt also transported Lauderdale to the police station after he was arrested for being loud and boisterous at the crime scene. Witt stated that Lauderdale never entered room 207.
 {¶ 46} Witt testified that he later reported to Elyria Hospital where he found Mayne with Defendant. Witt explained that after Mayne left, he interviewed Defendant and taped that conversation. Witt identified the tape and it was played for the jury. On cross-examination, Witt testified that he saw a nurse at Elyria hospital clean the area around Defendant's cut before stitching it.
 {¶ 47} In this tape, Defendant stated that he cut his hand on the tuna can because he did not have a can opener and used a screwdriver to open it. *Page 17 
Defendant stated that he and Armstrong were neighbors and denied doing any drugs with Armstrong.
 {¶ 48} Ronald Steward was a resident of room 202 at the Journey Inn on November 10, 2004. Steward knew Armstrong and Defendant and identified Defendant in the courtroom. Steward testified that Defendant borrowed a "real small pocketknife," with "at least a two-inch blade" from him a week prior to Armstrong's death, and never returned it. Steward explained that the knife was cheap and was not a heavy duty knife. It could not be used to open a can or for any kind of heavy work.
 {¶ 49} Jody Ganda is a fingerprint technician for the Elyria Police Department. Ganda examined latent finger prints taken from the Journey Inn and identified a print taken from a mirror in room 108 as belonging to Armstrong.
 {¶ 50} Larry Dehus is a forensic scientist who testified on behalf of Defendant. Mr. Dehus, employed by Law-Science Technologies, testified that he reviewed the crime scene photographs and autopsy report and that it was his opinion "that the assailant is going to have gotten a lot of blood on his person" and "a large quantity of blood on * * * his hands * * * and under the fingernails." Mr. Dehus further testified that to remove such trace evidence, a person would have to scrub hard with a brush and such could not be removed with "casual washing." Mr. Dehus finally testified that the weapon used to kill Armstrong was a knife with two and three-fourths inch blade that was one-half inch in width. *Page 18 
 {¶ 51} The final witness was Duran Mims, who testified on behalf of Defendant. Mims was a convicted felon that was incarcerated at the time of trial. Mims testified that he was at the Journey Inn before midnight on November 9, 2007. Mims explained that Defendant called him to deliver marijuana to the Journey Inn. Mims stated, however, that he did not sell the marijuana because no one had any money. Mims denied selling crack cocaine to anyone and he did not see a woman in the room. Mims identified Defendant as being one of the men in the room.
 {¶ 52} Defendant argues that no one witnessed Defendant murder Armstrong. Defendant also maintains that: (1) no one saw Defendant with Armstrong between 3:30 a.m. and 7:30 a.m. (the time of death) and no one heard a disturbance from Armstrong's room during this time; (2) Glime, who saw Defendant near room 207 around 7:30 a.m. testified that she did not see any blood on Defendant, did not see that Defendant was injured in any way, did not see Defendant with a knife, clothing or garbage, and never heard anyone use the dumpster that morning; (3) since Defendant did not have a car, he could not have transported any items off site; (4) no bloody clothes or the murder weapon were found; (5) no one saw Defendant with blood on him; (6) Gregorio testified that he saw Armstrong at 8:10 a.m. alive; (7) Defendant spent lots of time in room 207, thereby explaining his DNA being present there; (8) Armstrong's DNA was not *Page 19 
found on Defendant; and (9) evidence established that many people were in and out of room 207 that evening and any one of them could have killed Armstrong.
 {¶ 53} Based on our review of the entire record, we conclude that Defendant's criticisms of the State's evidence in this case are inadequate to prove that the jury lost its way and created a manifest miscarriage of justice. Otten, 33 Ohio App.3d at 340. Rather, we find it reasonable that the jury believed the State's version of the events, disbelieved the defense and convicted Defendant accordingly. It is clear that the jury found the prosecution's witnesses' "testimony to be plausible and supported by other circumstantial evidence. * * * The mere fact that the jury chose to believe the testimony of the prosecution's witnesses does not render a verdict against the manifest weight."State v. Wright, 9th Dist. No. 03CA0057-M, 2004-Ohio-603, at ¶ 17, citing State v. Moore, 9th Dist. No. 03CA0019, 2003-Ohio-6817, at ¶ 18;State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at *2. We conclude that the conviction was not against the manifest weight of the evidence.
 {¶ 54} Defendant's first assignment of error is overruled.
 Assignment of Error II "The Lorain County Court of Common Pleas erred in making various evidentiary rulings."
 {¶ 55} Defendant asserts that the trial court erred in failing to continue the trial when it became aware that Defendant "had not received all requested discovery" and in admitting such evidence over objection, thereby depriving *Page 20 
Defendant of his due process right and a fair trial. Defendant's brief fails to specifically describe the evidence at issue or point this Court to any page(s) in the transcript addressing the alleged errors. In his reply brief, Defendant asserts that the trial court erred when it admitted (1) the note recovered from [the victim's] room containing [Defendant's] bloody fingerprint; (2) crime scene photographs; (3) autopsy photographs; and (4) a BCI report. Once again, without pointing to the pages in the transcript reflecting any error, Defendant seems to be arguing that the note was erroneously admitted because of a chain of evidence problem and that the other items were erroneously admitted because electronic copies of the documents were not provided to Defendant on a disk and/or Defendant was not advised of how he could obtain the documents. Defendant does not cite any law or authority in support of his arguments.
 {¶ 56} App.R. 16(A)(7) provides that the brief of an Appellant must include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." See, also, Loc.R. 7(B)(7). This court may disregard an assignment of error that is not presented in accordance with this rule. See App.R. 12(A)(2).
 {¶ 57} Defendant's argument with respect to his second assignment of error consists of one paragraph in his brief and four short paragraphs in his reply brief *Page 21 
only asserting factual arguments in response to the State's brief, without citations to the record or references to the authorities upon which any alleged error rests. Defendant has failed to demonstrate any error by the trial court, and his second assignment of error is overruled.
 Assignment of Error III "The combined effect of the trial court's errors denied [Defendant] a fair trial."
 {¶ 58} In his final assignment of error, Defendant asserts that the cumulative effect of the trial court's erroneous denial of many of Defendant's pretrial motions deprived him of a fair trial. Defendant asserts that the trial court's denial of the following motions was erroneous: (1) motion for co-counsel and a bond reduction; and (2) motion for a forensic pathologist. Defendant also asserts that the trial court erred when it: (1) only allowed $750.00 for Defendant, who was indigent, to engage an investigator; (2) when it delayed ruling on various objections during the State's examination of various witnesses; and (3) when it admitted evidence never provided to the defense.
 {¶ 59} Once again, Defendant's brief fails to meet the requirements of App.R. 16(A)(7) or Loc.R. 7(B)(7) and we may disregard the assigned error pursuant to App.R. 12(A)(2). Defendant fails to cite to the record (except related to the trial court's denial of his motion for co-counsel and bond reduction) upon which he relies. Defendant fails to cite to any law or authority in support of any alleged errors in his brief and makes only cursory citations to some general law *Page 22 
and authority in his reply brief without, once again, pointing this Court's attention to the portions of the record upon which Defendant relies.
 {¶ 60} Moreover, with the exception of Defendant's assigned error related to the trial court's admission of evidence never provided to the Defendant during discovery, which we have already overruled in our discussion of Defendant's second assignment of error, none of the separate errors Defendant claims are cumulatively prejudicial were separately assigned and therefore, were not properly presented.State v. Gott (June 30, 1999), 6th Dist. No. L-97-1304, at *3. See, also, State v. Bell (Mar. 18, 1993), 8th Dist. No. 61827, at *19.
 {¶ 61} Defendant's third assignment of error is overruled.
Judgment Affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). *Page 23 
The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
 MOORE, P. J. WHITMORE CONCUR *Page 1